**UNITED STATES DISTRICT COURT**
**DISTRICT OF DISTRICT OF COLUMBIA**

| | |
|---|---|
| TEEMNOW LLC, d/b/a Exiles, on behalf of itself and all others similarly situated, 1610 U St. NW Washington, DC 20009, | Case No.: 1:20-cv-3153 |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| ERIE INSURANCE EXCHANGE 144 East 6th Street Erie, Pennsylvania 16501, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Teemnow LLC, d/b/a Exiles ("Plaintiff" or "Restaurant"), by and through its undersigned counsel and on behalf of itself and all others similarly situated, files this Class Action Complaint ("Complaint") against Defendant Erie Insurance Exchange, and alleges as follows:

## NATURE OF THE CLASS ACTION

1.     This proposed class action is about an insurance company, Erie Insurance Exchange ("Erie" or "Defendant"), that used a time of international crisis to blatantly cheat the Plaintiff out of money owed to it by issuing blanket denials to valid insurance claims.  Because Erie has not, and will not, comply with the terms of its insurance policies issued to the Plaintiff and other businesses, Plaintiff brings this case as a Rule 23 class action.

2.     Plaintiff owns and operates a celebrated restaurant, Exiles, located in the U Street Corridor of Washington, DC.  Serving as both a neighborhood tavern and a highly acclaimed sports bar, Exiles has become a fixture in the historic community and formed partnerships

with alumni associations and international fan groups to give people from around the world a welcoming place to watch their favorite teams and enjoy a quality meal.

3.      As has been well-documented over the past year, an international pandemic has cast a dark shadow over the planet, wreaking havoc on both human life and the economy. On March 11, 2020, World Health Organization ("WHO") Director General Tedros Adhanom Ghebreyesus declared the COVID-19 outbreak a worldwide pandemic:  "WHO has been assessing this outbreak around the clock and we are deeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction.  We have therefore made the assessment that COVID-19 can be characterized as a pandemic."[1]

4.      In March 2020, Plaintiff was forced to shut down its business due to the coronavirus pandemic and related events. The closure was a result of several orders issued by the state and local governments that required the Restaurant, its workers, and its customers to "shelter in place" and abide by strict "social distancing" guidelines. These orders forced the Restaurant to lay off employees and forgo income for several months while continuing to pay many regular expenses. This caused severe financial losses, which Plaintiff was unable to recoup even after it was able to re-open with strict limitations.

5.      Most businesses insure against such catastrophic events like the current unforeseen COVID-19 pandemic by purchasing all-risk commercial property insurance policies.  These policies promise to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, or curtailed, and when access to the premises is prohibited because of direct physical loss or damage to the property, or by a civil authority order

---

[1]      *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-mediabriefing- on-covid-19---11-march-2020.

that restricts or prohibits access to the property.  This coverage is commonly known as "business interruption coverage" and is standard in most all-risk commercial property insurance policies.

6.     Defendant, and most insurance companies that have issued all-risk commercial property insurance policies with business interruption coverage, are denying the obligation to pay for business income losses and other covered expenses incurred by policyholders for the physical loss and damage to the insured property from measures put in place by the civil authorities to stop the spread of COVID-19 among the population.  This class action brought by Plaintiff seeks a declaratory judgment that affirms that the COVID-19 pandemic and the corresponding response by civil authorities to stop the spread of the outbreak triggers coverage, has caused physical property loss and damage to the insured property, provides coverage for future civil authority orders that result in future suspensions or curtailments of business operations, and finds that Defendant is liable for the losses suffered by policyholders, including Plaintiff and the members of the Class

7.     In addition, this proposed class action asserts a claim against Defendant for breach of its contractual obligation under common all-risk commercial property insurance policies to indemnify Plaintiff and others similarly situated for business losses and extra expenses, and related losses resulting from actions taken by civil authorities to stop the human to human and surface to human spread of the COVID-19 outbreak.

8.     Under Rule 23, Plaintiff brings this action on behalf of a proposed class of policyholders who paid premiums in exchange for business insurance policies that included lost business income and extra expense coverage.

## PARTIES

9.     Plaintiff is a District of Columbia limited liability company with its principal place of business located in Washington, DC.

10.     Defendant is a Pennsylvania corporation with its principal place of business located in Erie, Pennsylvania, and it does business in this District.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction over this case pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed class and subclasses is a citizen of a state different from that of the Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the proposed class and subclasses each consist of more than 100 class members, and (d) none of the exceptions under 28 U.S.C. § 1332(d) apply to this action.

12.     This Court has personal jurisdiction over Defendant because it is registered to do business in the District of Columbia, has sufficient minimum contacts in the District of Columbia, and otherwise intentionally avails itself of the markets within the District of Columbia through its business activities, such that the exercise of jurisdiction by this Court is proper.  Moreover, the claims of Plaintiff and all of the members of the subclasses in this case arise out of and directly relate to Defendant's contacts with the District of Columbia.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Defendant has marketed, advertised, sold, and maintained insurance policies, and otherwise conducted extensive business activities, within this District.

## FACTUAL ALLEGATIONS

### I.    The Rapid Spread of Corona Virus

14.    COVID-19 is an infectious disease caused by a recently discovered novel coronavirus known as SARS-CoV-2 ("Coronavirus" or "COVID-19"). The first known instances of the disease spreading to humans were diagnosed in or around December 2019.

15.    In December 2019, an initial cluster of patients with an unknown cause of viral pneumonia was found to be linked to the Huanan seafood market in Wuhan, China, where many non-aquatic animals such as birds were also on sale. However, at least one of the patients never visited the market, though he had stayed in a hotel nearby before the onset of the illness.[2]

16.    By January 2020, genetic sequencing from patient samples was conducted to identify a novel virus, SARS-CoV-2, as the causative agent for the pneumonia cluster.[3] SARSCoV-2 is an RNA virus, with a crown-like appearance under an electron microscope because of glycoprotein spikes on its envelope. Among the functions of the structural proteins, the envelope has a crucial role in virus pathogenicity as it promotes viral assembly and release.[4]

17.    The first confirmed case of the virus outside China was diagnosed on January 13, 2020, in Bangkok, Thailand with the number of cases exceedingly increasing worldwide. On January 30, 2020, the WHO declared the SARS-CoV-2 outbreak constituted a public health

---

[2] *See id.*; Francesco Di Gennaro et al., *Coronavirus Diseases (COVID-19) Current Status and Future Perspectives a Narrative Review*, MDPI: INT'L J. ENVTL. RESEARCH & PUB. HEALTH (Apr. 1, 2020), https://www.mdpi.com/1660-4601/17/8/2690 (There are four genera of coronaviruses: (I) α-coronavirus (alphaCoV) and (II) β-coronavirus (betaCoV), which are probably present in bats and rodents; and (III) δ-coronavirus (deltaCoV) and (IV) γ-coronavirus (gammaCoV), which probably represent avian species.).
[3] *See* Di Gennaro, *supra* note 5.
[4] *See id.* (To address the pathogenetic mechanisms of SARS-CoV-2, its viral structure and genome must be considered. Coronaviruses are enveloped positive strand RNA viruses with the largest known RNA genomes – 30-32 kb – with a 5'-cap structure and 3'-poly-A tail.).

emergency of international concern, and by February 11, 2020, the disease caused by SARSCoV-2 was named "COVID-19" by the WHO Director-General.[5] As of April 23, 2020, the WHO reported a confirmed 2.5 million cases of COVID-19 globally and over 170,000 deaths, with the United States dealing with more than 800,000 confirmed cases and 40,000 deaths – more than any other country.[6]

18.     The clinical features of COVID-19 vary from asymptomatic forms to fatal conditions of severe respiratory failure that requires ventilation and support in an intensive care unit ("ICU"). Pneumonia has been the most frequent severe manifestation of COVID-19, with symptoms of fever, cough, dyspnea, and bilateral infiltrates on chest imaging.[7] There are no specific treatments recommended for COVID-19, and no vaccine is currently available; so understanding the complexities of COVID-19 is ongoing.[8]

19.     It has now been discovered by scientists that COVID-19 has several modes of transmission. Pursuant to a "Situation Report" released by the WHO, the virus can be transmitted

---

[5] *See id.*

[6] *See Coronavirus disease 2019 (COVID-19) Situation Report* – 94, WORLD HEALTH ORGANIZATION (Apr. 23, 2020) https://www.who.int/docs/default-source/coronaviruse/situationreports/20200423-sitrep-94-covid-19.pdf?sfvrsn=b8304bf0_4.

[7] *See* Di Gennaro, *supra* note 5 (Asymptomatic infections have also been described, but their frequency is unknown. Other, less common symptoms have included headaches, sore throat, and rhinorrhea. Along with respiratory symptoms, gastrointestinal symptoms (*e.g.*, nausea and diarrhea) have also been reported, and in some patients, they may be the presenting complaint.).

[8] *See id.* (The treatment is symptomatic, and oxygen therapy represents the major treatment intervention for patients with severe infection. Mechanical ventilation may be necessary in cases of respiratory failure refractory to oxygen therapy, whereas hemodynamic support is essential for managing septic shock. Different strategies can be used depending on the severity of the patient and local epidemiology. Home management is appropriate for asymptomatic or paucisymtomatic patients. They need a daily assessment of body temperature, blood pressure, oxygen saturation and respiratory symptoms for about 14 days. Management of such patients should focus on prevention of transmission to others and monitoring for clinical status with prompt hospitalization if needed.).

through symptomatic transmission, presymptomatic transmission, or asymptomatic transmission.[9] Symptomatic transmission refers to transmission by an individual who is experiencing symptoms associated with the virus who then transfers COVID-19 to another individual. Data from published studies provide evidence that COVID-19 is primarily transmitted from symptomatic people to others who are in close contact through respiratory droplets, by direct contact with infected persons, or by contact with contaminated objects and surfaces.[10]

20.     The incubation period for COVID-19, which is the time between exposure to the virus (becoming infected) and symptom onset, averages 5-6 days, however, it can be up to 14 days.[11] During this period, also known as the "presymptomatic" period, some infected persons can be contagious. For that reason, transmission from a presymptomatic case can occur before symptom onset. Presymptomatic transmission still requires the virus to be spread through infectious droplets or touching contaminated surfaces.[12]

21.     An individual who does not develop symptoms, an asymptomatic case of COVID-19, can still transmit the virus to another. Though there are few documented cases reported, it does not exclude the possibility that it has or may occur.[13]

---

[9] See World Health Organization, Coronavirus disease 2019 (COVID-19) Situation Report – 73 (Apr. 3, 2020), https://www.who.int/docs/default-source/coronaviruse/situationreports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2.

[10] See id. (Data from clinical and virologic studies that have collected repeated biological samples from confirmed patients provide evidence that shedding of the COVID-19 virus is highest in the upper respiratory tract (nose and throat) early in the course of the disease. That is, within the first three days from onset of symptoms. Preliminary data suggests that people may be more contagious around the time of symptom onset as compared to later on in the disease.).

[11] See id.

[12] See id. (In a small number of case reports and studies, pre-symptomatic transmission has been documented through contact tracing efforts and enhanced investigation of clusters of confirmed cases. This is supported by data suggesting that some people can test positive for COVID-19 from 1-3 days before they develop symptoms. Thus, it is possible that people infected with COVID-19 can transmit the virus before significant symptoms develop.).

[13] See id.

22.     Not only is COVID-19 transmitted via human-to-human, but the WHO and scientific studies have confirmed that the virus can live on contaminated objects or surfaces. According to a study by scientists documented in The New England Journal of Medicine, COVID-19 was detectable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard, and up to two to three days on plastic and stainless steel.[14] All of these materials are used in the preparation and service of food by restaurants. The results of the study suggest that individuals could get COVID-19 through indirect contact with surfaces or objects used by an infected person, whether or not they were symptomatic.

23.     Another scientific study documented in the Journal of Hospital Infection found that human coronaviruses, such as SARS-CoV and MERS-CoV can remain infectious on inanimate surfaces at room temperature for up to nine days.[15] At a temperature of 30 degrees Celsius or more, the duration of persistence is shorter. Contamination of frequently touched surfaces is, therefore, a potential source of viral transmission.[16] Though this study was not conclusive on COVID-19 itself, scientists are still grappling to understand this implication.

---

[14] See News Release, *New coronavirus stable for hours on surfaces*, NAT'L INSTS. OF HEALTH (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus- stable-hours-surfaces; see also World Health Organization, *Modes of transmission of virus causing COVID-19: implications for IPC* (Mar. 29, 2020), https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations (Airborne transmission of COVID-19 "may be possible in specific circumstances and settings in which procedures or support treatments that generate aerosols are performed; i.e., endotracheal intubation, bronchoscopy, open suctioning, administration of nebulized treatment, manual ventilation before intubation, turning the patient to the prone position, disconnecting the patient from the ventilator, non-invasive positive-pressure ventilation, tracheostomy, and cardiopulmonary resuscitation.").

[15] See G. Kampf et al., *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, J. HOSPITAL INFECTION (Jan. 31, 2020), https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820% 2930046-3.

[16] See id. (Although the viral load of coronaviruses on inanimate surfaces is not known during an outbreak situation, it seems plausible to reduce the viral load on surfaces by disinfection, especially of frequently touched surfaces in the immediate area surrounding a patient where the highest viral load can be expected. The WHO recommends ensuring that "environmental

24.     On March 27, 2020, the CDC released a report entitled "*Public Health Responses to COVID-19 Outbreaks on Cruise Ships - Worldwide, February - March 2020.*"[17] The report detailed that during this time frame, COVID-19 outbreaks associated with three different cruise ship voyages caused over 800 confirmed cases and ten deaths.[18] Of the individuals tested, a high proportion were found to be asymptomatic, which may explain the high rates on cruise ships. What is interesting about this study though, is that COVID-19 was identified on a variety of surfaces in cabins of both symptomatic and asymptomatic infected passengers up to 17 days after cabins were vacated on the Diamond Princess cruise line, but before disinfection procedures had been conducted.[19] The CDC notes that more studies are required to understand the perpetuation of

---

cleaning and disinfection procedures are followed consistently and correctly.").

[17] *See* Leah F. Moriarty, MPH, *Public Health Responses to COVID-19 Outbreaks on Cruise Ships - Worldwide, February - March 2020*, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid= mm6912e3_w.

[18] *See id.* ("During February 7-23, 2020, the largest cluster of COVID-19 cases outside mainland China occurred on the Diamond Princess cruise ship, which was quarantined in the port of Yokohama, Japan, on February 3…. On March 6, cases of COVID-19 were identified in persons on the Grand Princess cruise ship off the coast of California; that ship was subsequently quarantined. By March 17, confirmed cases of COVID-19 had been associated with at least 25 additional cruise ship voyages. On February 21, CDC recommended avoiding travel on cruise ships in Southeast Asia; on March 8, this recommendation was broadened to include deferring all cruise ship travel worldwide for those with underlying health conditions and for persons [over] 65 years. On March 13, the Cruise Lines International Association announced a 30-day voluntary suspension of cruise operations in the United States. CDC issued a level 3 travel warning on March 17, recommending that all cruise travel be deferred worldwide.").

[19] See id. ("Cruise ships are often settings for outbreaks of infectious diseases because of their closed environment, contact between travelers from many countries, and crew transfers between ships. On the Diamond Princess, transmission largely occurred among passengers before quarantine was implemented, whereas crew infections peaked after quarantine…. On the Grand Princess, crew members were likely infected on voyage A and then transmitted [COVID-19] to passengers on voyage B. The results of testing of passengers and crew on board the Diamond Princess demonstrated a high proportion (46.5%) of asymptomatic infections at the time of testing. Available statistical models of the Diamond Princess outbreak suggest that 17.9% of infected persons never developed symptoms…. A high proportion of asymptomatic infections could partially explain the high attack rate among cruise ship passengers and crew…. Although these data cannot be used to determine whether transmission occurred from contaminated surfaces, further study of fomite transmission of [COVID-19] aboard cruise ships

transmission, but what is clear is the uncertainty around COVID-19 and its implications for the lawful and safe functioning of a variety of businesses, most significantly, food service businesses.

25.     Without a vaccine to protect against COVID-19, effective control of the outbreak relies on measures designed to reduce human-to-human and surface-to-human exposure. Recent information on the CDC's website provides that COVID-19 spreads when people are within six feet of each other or when a person comes in contact with a surface or object that has the virus on it.[20] Various other sources state that close contact with a person with the virus or surfaces where the virus is found can transmit the virus.[21]

26.     The secondary exposure of the surface-to-humans is particularly acute in places where the public gathers typically to socialize, eat, drink, shop, be entertained, and go for recreation. This is why the CDC recommends that in viral outbreaks individuals who are infected stay at home and those who are not sick engage in preventive measures such as constant hand washing and avoiding activities that would bring them into close proximity of people with the virus or surfaces where the virus may reside. However, because these recommendations have proven ineffective to minimize the spread of COVID-19, containment efforts have led to civil authorities issuing orders closing many business establishments, including restaurants, bars, hotels, theaters, personal care salons, gyms, and schools, and mandating social distancing among the

---

is warranted.").

[20] *See* Centers for Disease Control and Prevention, How COVID-19 Spreads, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-COVID- spreads.html (last visited Apr. 27, 2020).

[21] *See* Kampf, *supra* note 18 (remains infectious from two hours to 28 days depending on conditions); *see also* Nina Bai, *Why One Test May Not Be Enough*, UCSF (Feb. 13, 2020), https://www.ucsf.edu/news/2020/02/416671/how-new-coronavirus-spreads-and-progresses-andwhy-one-test-may-not-be-enough (door knobs and table tops can contain the virus); Heather Murphy, *Surfaces? Sneezes? Sex? How the Coronavirus Can and Cannot Spread*, N.Y. TIMES (Mar. 19, 2020), https://www.nytimes.com/2020/03/02/health/coronavirus-how-it-spreads.html (virus can remain on metal and plastic for several days).

population. This has caused the cancelation of sporting events, parades, and concerts, the closure of amusement parks, and substantial travel restrictions.

27.     Such "stay-at-home" orders are in effect in all but five states: 35 states have closed all non-essential businesses with other states enacting measures to curtail business operations; all 50 states have closed schools; and all but one state has closed restaurants and bars for services other than take-out and delivery (the "Closure Orders").[22]

## II.     Closure Orders Shutdown Businesses Across the Country.

28.     On March 16, 2020, the Centers for Disease Control and Prevention, and members of the national Coronavirus Task Force issued to the American public guidance, styled as "30 Days to Slow the Spread" concerning measures to slow the spread of COVID-19.  This guidance advocated for far-reaching social distancing measures, such as working from home, avoiding shopping trips and gatherings of more than ten (10) people, and staying away from bars, restaurants, and food courts.

29.     Following this advice and recognizing that there had been numerous confirmed cases of COVID-19 in their jurisdictions, many state government administrations across the nation recognized the need to take steps to protect their residents from the spread of COVID-19. As a result, many governmental administrations entered civil authority orders suspending or severely curtailing business operations of non-essential businesses that interact with the public and provide gathering places for the individuals.

30.     To help create a framework for the implementation of such policies in D.C., on March 11, 2020, D.C. Mayor Muriel Bowser declared a state of emergency and a public health

---

[22] See Kaiser Family Foundation, *State Data and Policy Actions to Address Coronavirus* (Apr. 27, 2020), https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-toaddress-coronavirus/.

emergency due to the "imminent hazard of or actual occurrence of widespread exposure to an infectious agent (COVID-19) that poses a significant risk of substantial future harm to a large number of people in the District of Columbia." Mayor's Order No. 2020-045 (March 11, 2020); Mayor's Order No. 2020-046 (March 11, 2020).

31.     On March 16, 2020, Mayor Bowser issued an order prohibiting "table seating" at restaurants and taverns operating in D.C., effective at 10:00 pm that night due to the essential need to slow the spread of COVID-19 and "safeguard public health, safety, and welfare" of people living in, and present in, D.C. Mayor's Order No. 2020-048 (March 16, 2020).

32.     On March 20, 2020, the Mayor extended her previous declarations of a state of emergency and a public health emergency until April 24, 2020. Mayor's Order No. 2020-050 (March 20, 2020). On the same day, the Mayor issued an order extending the prohibition on "table service" at restaurants and taverns from April 1, 2020 until April 24, 2020, and prohibiting service to "standing customers at restaurants, bars, taverns, and multi-purpose facilities." Mayor's Order No. 2020-051 (March 20, 2020).

33.     On March 24, 2020, Mayor Bowser ordered the closure of all non-essential businesses in order to "limit interactions among people to the greatest extent practicable by limiting public activity." Mayor's Order No. 2020-053 (March 24, 2020).

34.     On March 30, 2020, Mayor Bowser ordered all D.C. residents to stay in their residences except for limited "essential" reasons. Mayor's Order No. 2020-054 (March 30, 2020).

35.     On April 15, 2020, the Mayor extended her previous declarations of a state of emergency and a public health emergency until May 15, 2020 and ordered that all D.C. residents continue to stay in their residences except for limited "essential" reasons. Mayor's Order No. 2020-063 (April 15, 2020). The Order also amended the Mayor's March 24th order to require that "food

sellers ... must require employees and independent contractors to wear gloves and cloth or surgical masks and instruct employees and independent contractors on safe use." The Order requires that businesses procure their own gloves and masks. Finally, the Order extended all provisions of the Mayor's previous COVID-19 related orders until May 15, 2020.

36.     Because the criteria for reopening had not been met, including a decline in either new daily COVID-19 cases or daily COVID-19 deaths, on May 13, 2020, the Mayor extended her previous declarations of a state of emergency and a public health emergency until June 8, 2020 and ordered that all D.C. residents continue to stay in their residences except for limited "essential" reasons. Mayor's Order No. 2020-066 (May 13, 2020). The Mayor has issued multiple extensions of the previous declarations that greatly restrains the food service industry. (Orders collectively referred to as "Closure Orders").

37.     On May 27, 2020, the Mayor authorized limited outdoor dining as part of DC's Phase One re-opening plan. Mayor's Order No. 2020-067. On June 22, the Mayor authorized indoor dining at 50% capacity, subject to special distancing requirements, as part of DC's Phase Two re-opening plan.  Mayor's Order No. 2020-103. These Closure Orders caused a diminishment of functional space and loss of functionality of covered property.

38.     In compliance with the Closure Orders and recommendations, the Restaurant closed all operations from March 16 to May 29, 2020. It was able to re-open a portion of its space once the mayor allowed outdoor dining options again in DC. Upon re-opening, the Restaurant was still required to operate at limited capacity in conformance with the Closure Orders and best practices. The limited functionality of the Restaurant's space will continue for the foreseeable future; and even after the current shutdown orders end, certain forms of governmentally-imposed social distancing are likely to remain in place for an indefinite period of time.

39.     As a direct consequence of the Closure Orders, which were issued to protect the public safety, since March 16, 2020, Plaintiff and the members of the Class have suffered a significant loss of business income and incurred extra expenses. Among other things, the Closure Orders caused a diminishment of functional space and loss of functionality of covered property.

## III.     Defendant's Standard All-Risk Commercial Property Insurance Policies.

40.     In many countries, property insurance is sold on a "specific peril" basis.  Such policies only cover losses from causes that are expressly covered like an earthquake, fire, or terrorist attack.  Conversely, most property policies sold in the United States are "all-risk" property damage policies which cover losses from *all* causes that are not expressly excluded.

41.     Defendant's insurance policy(ies) issued to Plaintiff and the members of the Class are "all-risk" commercial property polices that cover loss or damage to the covered premises resulting from all risks, except those expressly excluded.

42.     Plaintiff's policy, as well as the policies of other Class members, are standard forms that are used by Defendant for all insureds having applicable coverage and provide identical or substantially similar coverage for all Class members.

## IV.     Plaintiff's Factual Allegations

43.     To protect itself and the income generated by its business operations, Plaintiff purchased a policy of insurance issued by Erie with policy number Q462350840 (the "Policy"). (Attached as Exhibit 1.) The Policy includes Erie's Ultraflex Commercial Property Coverage (Form FX-00-01 (Ed. 11/18) UF-3553).

44.     Among the coverages provided by the Policy was business interruption insurance, which, generally, would indemnify Plaintiff for lost income and profits in the event that its business was shut down.

45.     Specifically, the Policy provided coverage for Income Protection – Coverage 3, in

Plaintiff's Policy states:

### ADDITIONAL INCOME PROTECTION - COVERAGE 3

#### A.   Additional Income Protection Coverage

Income Protection means loss of "income" and/or "rental income" you sustain due to partial or total "interruption of business" resulting directly from "loss" or damage to property on the premises described in the "Declarations" from a peril insured against. "Loss" or damage also includes property in the

open, or in a vehicle, on the premises described in the "Declarations" or within 1,500 feet thereof.

If you are a tenant, your premises are the portion of the building described in the "Declarations" which:

1.   You rent, lease, or occupy;

2.   All routes within the building that service or are used to gain access to the described premises; and

3.   The area within 1,500 feet of the premises described in the "Declarations" (with respect to "loss" or damage to covered property in the open or in a vehicle).

You are required to resume normal business operations as promptly as possible and shall use all available means to eliminate any unnecessary delay.

46.     The Policy also provides coverage for "Extra Expenses" incurred:

**B.  Extra Expense Coverage**

Extra expense coverage is provided at the premises described in the "Declarations" only if the "Declarations" show that Additional Income Protection Coverage applies to that premises.

"Extra expense" means necessary expenses you incur due to partial or total "interruption of business" resulting directly from "loss" or damage to property on the premises described in the "Declarations" from a peril insured against. "Loss" or damage also includes property in the open, or in a vehicle, on the premises described in the "Declarations" or within 1,500 feet thereof.

We will pay necessary actual and necessary "extra expenses" (other than the expense to repair or replace property) sustained by you to:

1.  Avoid or minimize the "interruption of business" and to continue your business operations:

    a.  At the premises described in the "Declarations"; or

    b.  At replacement premises or at temporary locations, including:

        1)  Relocation expenses; and

        2)  Costs to equip and operate the replacement premises or temporary locations.

2.  Minimize the "interruption of business" if you cannot continue your business operations to the extent it reduces the amount of loss that would have been payable under loss of "income" and/or "rental income".

47.     Additionally, the Policy provides "Civil Authority" coverage:

**C.   Additional Coverages**

1.   **Civil Authority**

When a peril insured against causes damage to property other than property at the premises described in the "Declarations", we will pay for the actual loss of "income" and/or "rental income" you sustain and necessary "extra expense" caused by action of civil authority that prohibits access to the premises described in the "Declarations" provided that both of the following apply:

a.   Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the premises described in the "Declarations" are within that area but are not more than one mile from the damaged property; and

b.   The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the peril insured against that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority coverage for "income" and/or "rental income" will begin 72 hours after the time of the first action of civil authority that prohibits access to the premises described in the "Declarations" and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority coverage for "extra expense" will begin immediately after the time of the first action of civil authority that prohibits access to the premises described in the "Declarations" and will end:

a.   Four consecutive weeks after the date of that action; or

b.   When your Civil Authority coverage for "income" and/or "rental income" ends;

whichever is later.

48.     Plaintiff and the members of the Class lost business income (that otherwise would have been earned) and related expenses during a necessary interruption of their business / operations or the untenantability of their insured premises because they have been unable to use their property for its intended purpose.

49.     The Policy contains an exclusion for damage caused by contamination by any virus.

> **B.   Coverages 1, 2,** and **3**
>
> We do not cover under Building(s) - Coverage 1, Business
> Personal Property and Personal Property of Others - Coverage
> 2, and Additional Income Protection - Coverage 3 "loss" or
> damage caused:
>
> ….
>
>> 16.  By or resulting from any virus, bacterium, or other
>>      microorganism that induces or is capable of inducing
>>      physical distress, illness, or disease.

50.     This exclusion is not applicable in this case because Plaintiff's losses were not "by or resulting from any virus…." Rather, the sole proximate cause of Plaintiff's losses was the Closure Orders, and not because coronavirus contaminated Plaintiff's property or that the virus itself caused damage to Plaintiff's insured property.  Also, the virus exclusion was also not properly included in the policy.

51.     Moreover, the virus exclusion is ambiguous. It is not clear that the plain language of the policy unambiguously and necessarily excludes Plaintiff's losses that were caused by the Closure Orders.

52.     Notwithstanding the foregoing facts and circumstances, by way of letter dated March 26, 2020, Erie wrongfully denied Plaintiff's claims for business interruption coverage.

## V.     The Closure Orders Have Affected Policyholders Nationwide.

53.     The Closure Orders are physically impacting private commercial property throughout the United States and the District of Columbia, threatening the survival of thousands of restaurants, retail establishments, and other businesses that have had their business operations suspended or curtailed indefinitely by order of civil authorities.

54.     Exiles does not intend to cover losses caused by the Closure Orders as part of business interruption coverage.  As previously stated, Exiles denied Plaintiff's claim, even though Plaintiff was forced to close its doors due to the Closure Orders.  Upon information and belief, Exiles has denied similar claims submitted by other Class members across-the-board, a practice which is belied by not only the express terms of the insurance policies, but also: (a) the U.S. Small Business Administration's requirement that "reimbursement" from "business interruption insurance" be submitted along with an application for an Economic Injury Disaster Loan ("EIDL") loan;[23] and (b) America's SBDC, whose COVID-19 newsletter expressly states: "Business interruption insurance also applies if government actions cause operations to cease temporarily, which results in a loss for a firm."[24]

55.     As a result, many small businesses that maintain commercial multi-peril insurance policies with business interruption coverage will have significant uninsured losses absent declaratory relief from this Court.  Indeed, even if state and local governments re-open, small businesses certainly still governed by social-distancing mandates and will continue to experience diminishing revenues due to the loss of covered property.

56.     A declaratory judgment determining that the business income coverage provided in standard commercial property insurance policies applies to the suspension, curtailment, and interruption of business operations resulting from measures put into place by civil authorities is necessary to prevent Plaintiff and the members of the Class from being denied critical coverage for which they have collectively paid millions of dollars in premiums.

---

[23]     *Applying for SBA Disaster Loans (EIDL)* at 12, U.S. SMALL BUS. ADMIN. (Mar. 26, 2020), https://www.sba.gov/sites/default/files/articles/EIDL_

[24]     *COVID-19: The Latest News and Resources for Your Business*, at 15, AMERICA'S SBDC (Mar. 20, 2020), https://www.dropbox.com/s/jcw2iw9vk2hcq9y/COVID%2019%20-%20Rev6.pdf?dl=0 (last visited Apr. 30, 2020).

## CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this lawsuit pursuant to Federal Rule of Civil Procedure 23(a) and

(b)(3) on behalf of itself and all other persons similarly situated.

The Multi-State Class is defined as:

All entities who have entered into standard all-risk commercial property insurance policies with Erie Insurance Exchange insuring property in the United States, where such policies provide for Additional Income Protection, Extra Expense, or Civil Authority coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by civil authorities' stay-at-home or shelter-in-place orders since March 16, 2020.

The District of Columbia Sub-Class is defined as:

All entities who have entered into standard all-risk commercial property insurance policies with Erie Insurance Exchange insuring property in the District of Columbia, where such policies provide for Additional Income Protection, Extra Expense, or Civil Authority coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by civil authorities' stay-at-home or shelter-in-place orders since March 16, 2020.

Excluded from each Class and from the Sub-Class are the Defendant, its employees, officers,

directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or

affiliated companies; class counsel and their employees; and the judicial officers and their

immediate family members and associated court staff assigned to this case.

58.     Plaintiff reserves the right to modify, expand, or amend the definitions of the

proposed classes following the discovery period and before the Court determines whether class

certification is appropriate.

59.     Certification of Plaintiff's claims for class-wide treatment is appropriate because

Plaintiff can prove the elements of its claim and Class members' claims on a class-wide basis using

the same evidence as would prove those elements in individual actions alleging the same claims.

## I.      Numerosity

60.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). The Class numbers at least in the hundreds and consists of geographically dispersed business entities who are insured for business interruption losses. Defendant sells insurance policies throughout the United States. As such, joinder of the Class members is impracticable.

61.     The identity of Class members is ascertainable because the names and addresses of all Class members can be identified in Defendant's or its agents' books and records. Plaintiff anticipates providing appropriate notice to the Class in compliance with Fed. R. Civ. P. 23(c)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

## II.     Typicality

62.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiff's claims are typical of the claims of each of the Class members because all Class members were and are similarly affected and their claims arise from the same all-risk commercial property insurance policy provisions entered into with Erie.  Each Class member's insurance policy contains the same form providing coverage for business income loss. None of the forms exclude coverage due to a governmental action intended to reduce the effect of the ongoing global pandemic. As a result, a declaratory judgment as to the rights and obligations under Plaintiff's Policy will address the rights and obligations of all policyholders.

## III.    Adequacy of Representation

63.     Plaintiff is committed to prosecuting the action, will fairly and adequately protect the interests of the members of the class, and has retained counsel competent and experienced in class action litigation, including litigation relating to insurance policies.  Plaintiff is aware of no

interests antagonistic to or in conflict with other members of the Class.  Plaintiff anticipates no difficulty in the management of this litigation as a class action.

## IV.    Commonality

64.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) because there are questions of law and fact that are common to each of the Class and Sub-Class.  These common questions predominate over any questions affecting only individual Class members.  The questions of law and fact common to the Class include, but are not limited to:

A.  Whether there is an actual controversy between Plaintiff and Defendant as to the rights, duties, responsibilities and obligations of the parties under the business interruption provisions in standard all-risk commercial property insurance policies;

B.  Whether measures in response to the COVID-19 pandemic are excluded from Plaintiff's and the Class members' standard all-risk commercial property insurance policies;

C.  Whether the measures put in place by civil authorities' Closure Orders, stay-at-home, or shelter-in-place orders since March 16, 2020, resulted in a covered loss to covered commercial property;

D.  Whether Defendant has repudiated and anticipatorily breached the all-risk commercial property insurance policies it issued with business interruption coverage by intending to deny claims for coverage; and

E.  Whether Plaintiff and the Class members suffered damages as a result of the anticipatory breach by Defendant.

## V.     Superiority/Predominance

65.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of the rights of the class members.  The joinder of individual class members is impracticable because of the vast number of Class members who have entered into the standard all-risk commercial property insurance policies with Defendant.

66.     Because a declaratory judgment as to the rights and obligations under the uniform all-risk commercial property insurance policies will apply to all Class members, most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions. The burden imposed on the judicial system by individual litigation, and to Defendant, by even a small fraction of the Class members, would be substantial.

67.     In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the judiciary and the parties, and far more effectively protects the rights of each Class member.  The benefits to the legitimate interests of the parties, the Court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation.  Class adjudication is superior to other alternatives under Fed. R. Civ. P. 23(b)(3)(D).  Class action treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit.

68.     Plaintiff knows of no obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.   The Court may, on motion of Plaintiff or on its own

determination, certify nationwide and statewide classes for claims sharing common legal questions; use the provisions of Rule 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and use Rule 23(c)(5) to divide any Class into subclasses.

<u>**COUNT ONE**</u>
**DECLARATORY RELIEF – INCOME PROTECTION COVERAGE**
**(On Behalf of the Multi-State Class and District of Columbia Subclass)**

69.     Plaintiff re-alleges and incorporates by reference into this cause of action all allegations set forth in the preceding paragraphs of this Complaint.  To the extent necessary, this cause of action is pleaded in the alternative to the other causes of action.

70.     Plaintiff brings this claim for declaratory relief individually and on behalf of the other members of the Multi-State Class and District of Columbia Subclass.

71.     Plaintiff's Policy, as well as those of the other Class members, are contracts under which Defendant was paid premiums in exchange for its promise to pay Plaintiff's and the other Class members' losses for claims covered by the Policies.

72.     On information and belief, Plaintiff and other Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Defendant or Defendant is estopped from asserting them, and yet Defendant has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class members are entitled.

73.     On information and belief, Defendant has denied claims related to Closure Orders on a uniform and class-wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

74.     An actual case or controversy exists regarding Plaintiff's and the other Class members' rights and Defendant's obligations under the Policies to reimburse Plaintiff and Class members for the full amount of Income Protection losses incurred by Plaintiff and the other Class members in connection with the period of partial or total interruption of business stemming from the Closure Orders.

75.     Pursuant to 28 U.S.C. § 2201, Plaintiff and the other Class members seek a declaratory judgment from this Court declaring the following:

(a) Plaintiff and the other Class members incurred Income Protection losses in connection with the Closure Orders and the necessary interruption of their businesses stemming from such orders;

(b) Defendant is obligated to pay Plaintiff and other Class members for the full amount of the Income Protection losses incurred and to be incurred in connection with the Closure Orders during the period of partial or total interruption of business stemming from such orders.

**COUNT TWO**
**BREACH OF CONTRACT – INCOME PROTECTION COVERAGE**
**(On Behalf of the Multi-State Class and District of Columbia Subclass)**

76.     Plaintiff re-alleges and incorporates by reference into this cause of action all allegations set forth in the preceding paragraphs of this Complaint.  To the extent necessary, this cause of action is pleaded in the alternative to the other causes of action.

77.     Plaintiff brings this claim individually and on behalf of the other members of the Multi-State Class and District of Columbia Subclass.

78.     Plaintiff's Policy, as well as those of the other Class members, are contracts under which Defendant was paid premiums in exchange for its promise to pay Plaintiff's and the other Class members' losses for claims covered by the Policies.

79.     In the Policies, Defendant agreed to pay for its insureds' loss of income sustained due to partial or total interruption of business resulting directly from a loss or damage to their insured premises.

80.     The Closure Orders caused a direct and accidental loss of or damage to the Plaintiff and other Class member's insured property. The Closure Orders necessitated a partial or total interruption of business at the insured property.  Losses caused by the Closure Orders thus triggered the Income Protection coverage of Plaintiff's and the other Class members' Erie policies.

81.     On information and belief, Plaintiff and the other Class members have complied with all applicable provisions of their policies and/or those provisions have been waived by Defendant or Defendant is estopped from asserting them, and yet Defendant has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

82.     By denying coverage for any Income Protection losses incurred by Plaintiff and other Class members as a result of the Closure Orders, Defendant has breached its coverage obligations under the Policies.

83.     As a result of Defendant's breaches of the Policies, Plaintiff and the other Class members have sustained substantial damages for which Defendant is liable, in an amount to be established at trial.

**COUNT THREE**
**DECLARATORY RELIEF – EXTRA EXPENSE COVERAGE**
**(On Behalf of the Multi-State Class and District of Columbia Subclass)**

84.     Plaintiff re-alleges and incorporates by reference into this cause of action all allegations set forth in the preceding paragraphs of this Complaint.  To the extent necessary, this cause of action is pleaded in the alternative to the other causes of action.

85.     Plaintiff brings this claim for declaratory relief individually and on behalf of the other members of the Multi-State Class and District of Columbia Subclass.

86.     Plaintiff's Policy, as well as those of the other Class members, are contracts under which Defendant was paid premiums in exchange for its promise to pay Plaintiff's and the other Class members' losses for claims covered by the Policies.

87.     On information and belief, Plaintiff and other Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Defendant or Defendant is estopped from asserting them, and yet Defendant has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class members are entitled.

88.     On information and belief, Defendant has denied claims related to Closure Orders on a uniform and class-wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

89.     An actual case or controversy exists regarding Plaintiff's and the other Class members' rights and Defendant's obligations under the Policies to reimburse Plaintiff and Class members for the full amount of Extra Expense losses incurred by Plaintiff and the other Class members in connection with the period of partial or total interruption of business stemming from the Closure Orders.

90.     Pursuant to 28 U.S.C. § 2201, Plaintiff and the other Class members seek a declaratory judgment from this Court declaring the following:

(a) Plaintiff and the other Class members incurred Extra Expense losses in connection with the Closure Orders and the necessary interruption of their businesses stemming from such orders;

(b) Defendant is obligated to pay Plaintiff and other Class members for the full amount of the Extra Expense losses incurred and to be incurred in connection with the Closure Orders during the period of partial or total interruption of business stemming from such orders.

**<u>COUNT FOUR</u>**
**BREACH OF CONTRACT – EXTRA EXPENSES COVERAGE**
**(On Behalf of the Multi-State Class and District of Columbia Subclass)**

91.     Plaintiff re-alleges and incorporates by reference into this cause of action all allegations set forth in the preceding paragraphs of this Complaint.  To the extent necessary, this cause of action is pleaded in the alternative to the other causes of action.

92.     Plaintiff brings this claim individually and on behalf of the other members of the Multi-State Class and District of Columbia Subclass.

93.     Plaintiff's Policy, as well as those of the other Class members, are contracts under which Defendant was paid premiums in exchange for its promise to pay Plaintiff's and the other Class members' losses for claims covered by the Policies.

94.     In the Policies, Defendant agreed to pay for its insureds' necessary expenses incurred due to partial or total interruption of business resulting directly from a loss or damage to their insured premises.

95.     The Closure Orders caused a direct and accidental loss of or damage to the Plaintiff and other Class member's insured property. The Closure Orders necessitated a partial or total interruption of business at the insured property.  Losses caused by the Closure Orders thus triggered Extra Expense coverage of Plaintiff's and the other Class members' Erie policies.

96.     On information and belief, Plaintiff and the other Class members have complied with all applicable provisions of their policies and/or those provisions have been waived by Defendant or Defendant is estopped from asserting them, and yet Defendant has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

97.     By denying coverage for any Extra Expense losses incurred by Plaintiff and other Class members as a result of the Closure Orders, Defendant has breached its coverage obligations under the Policies.

98.     As a result of Defendant's breaches of the Policies, Plaintiff and the other Class members have sustained substantial damages for which Defendant is liable, in an amount to be established at trial.

## COUNT FIVE
## DECLARATORY RELIEF – CIVIL AUTHORITY COVERAGE
### (On Behalf of the Multi-State Class and District of Columbia Subclass)

99.     Plaintiff re-alleges and incorporates by reference into this cause of action all allegations set forth in the preceding paragraphs of this Complaint.  To the extent necessary, this cause of action is pleaded in the alternative to the other causes of action.

100.     Plaintiff brings this claim for declaratory relief individually and on behalf of the other members of the Multi-State Class and District of Columbia Subclass.

101.    Plaintiff's Policy, as well as those of the other Class members, are contracts under which Defendant was paid premiums in exchange for its promise to pay Plaintiff's and the other Class members' losses for claims covered by the Policies.

102.    On information and belief, Plaintiff and other Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Defendant or Defendant is estopped from asserting them, and yet Defendant has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class members are entitled.

103.    On information and belief, Defendant has denied claims related to Closure Orders on a uniform and class-wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

104.    An actual case or controversy exists regarding Plaintiff's and the other Class members' rights and Defendant's obligations under the Policies to reimburse Plaintiff and Class members for the full amount of Civil Authority losses incurred by Plaintiff and the other Class members in connection with the period of partial or total interruption of business stemming from the Closure Orders..

105.    Pursuant to 28 U.S.C. § 2201, Plaintiff and the other Class members seek a declaratory judgment from this Court declaring the following:

(c) Plaintiff and the other Class members incurred Civil Authority losses in connection with the Closure Orders and the necessary interruption of their businesses stemming from such orders;

(d) Defendant is obligated to pay Plaintiff and other Class members for the full amount of the Civil Authority losses incurred and to be incurred in connection with the Closure

Orders during the period of partial or total interruption of business stemming from such orders.

**COUNT SIX**
**BREACH OF CONTRACT – CIVIL AUTHORITY COVERAGE**
**(On Behalf of the Multi-State Class and District of Columbia Subclass)**

106.    Plaintiff re-alleges and incorporates by reference into this cause of action all allegations set forth in the preceding paragraphs of this Complaint.  To the extent necessary, this cause of action is pleaded in the alternative to the other causes of action.

107.    Plaintiff brings this claim individually and on behalf of the other members of the Multi-State Class and District of Columbia Subclass.

108.    Plaintiff's Policy, as well as those of the other Class members, are contracts under which Defendant was paid premiums in exchange for its promise to pay Plaintiff's and the other Class members' losses for claims covered by the Policies.

109.    In the Policies, Defendant agreed to pay for its insureds' loss of income and extra expenses sustained as a result of an action of a civil authority that prohibits access to the insured premises, when the civil authority action is taken in response to damage to property other than the insured premises but within one mile of the insured premises.

110.    The Closure Orders triggered Civil Authority coverage in Plaintiff's and the other Class members' Erie policies.

111.    On information and belief, Plaintiff and the other Class members have complied with all applicable provisions of their policies and/or those provisions have been waived by Defendant or Defendant is estopped from asserting them, and yet Defendant has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

112.    By denying coverage for any Civil Authority coverage losses incurred by Plaintiff and other Class members as a result of the Closure Orders, Defendant has breached its coverage obligations under the Policies.

113.    As a result of Defendant's breaches of the Policies, Plaintiff and the other Class members have sustained substantial damages for which Defendant is liable, in an amount to be established at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the members of the Class and Subclasses, prays for judgment in their favor and against Defendant, as follows:

a.  Declaring this action to be a proper class action maintainable pursuant to Fed. R. Civ. P. 23(a) and Rule 23(b)(3) and declaring Plaintiff and its counsel to be representatives of the Class;

b.  Issuing a Declaratory Judgment declaring the Parties' rights and obligations under the insurance policies;

c.  Awarding Plaintiff and the Class members compensatory damages due to Defendant's breach of the insurance policies in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

d.  Awarding Plaintiff and the Class members costs and disbursements and reasonable allowances for the fees of Plaintiff's and the class's counsel and experts, and reimbursement of expenses; and

e.  Awarding such other and further relief the Court deems just, proper, and equitable.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.


Dated: October 30, 2020.                         Respectfully submitted,

                                                 /s/ Brad Ponder
                                                 Brad Ponder (1612774)
                                                 MONTGOMERY PONDER, LLC
                                                 1015 15th Street NW
                                                 Suite 600
                                                 Washington, DC 20005
                                                 Phone: 888.201.0305
                                                 Fax: 205.208.9443
                                                 brad@montgomeryponder.com

                                                 Luke Montgomery
                                                 (*pro hac vice* application to be filed)
                                                 MONTGOMERY PONDER, LLC
                                                 2226 1st Avenue North
                                                 Unit 105
                                                 Birmingham, AL 35233
                                                 Phone: 888.201.0305
                                                 Fax: 205.208.9443
                                                 luke@montgomeryponder.com